IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CT-3272-D

| | |
|---|---|
| JAMEY L. WILKINS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| ) | |
| MR. VAUGHN, et al., ) | |
| ) | |
| Defendants. ) | |

On November 4, 2013, Jamey L. Wilkins ("Wilkins" or "plaintiff"), a state inmate proceeding pro se, filed this civil rights action pursuant to 42 U.S.C. § 1983, alleging violations of his Eighth Amendment rights [D.E. 1]. On July 18, 2014, the court reviewed the complaint pursuant to 28 U.S.C. § 1915A, dismissed Wilkins's claim concerning showering in full restraints, dismissed defendants Vaughn, Minor, and Ross, and allowed Wilkins to proceed with his remaining claims [D.E. 7]. On November 18, 2014, the remaining defendants answered the complaint [D.E. 15]. On December 5, 2014, Magistrate Judge Robert B. Jones, Jr. entered a scheduling order [D.E. 16]. On February 11, 2015, the court denied Wilkins's motions for reconsideration of the court's order dismissing his claim concerning showering in restraints and appointment of counsel, and referred Wilkins's motions to compel discovery to Magistrate Judge Jones [D.E. 32]. On April 17, 2015, Magistrate Judge Jones ruled on several discovery-related motions and granted Wilkins's motions in part, together with defendants' motion for a protective order [D.E. 41]. On April 30, 2015, Wilkins moved for reconsideration of Magistrate Judge Jones's order [D.E. 42].

On February 4, 2015, defendants moved for summary judgment [D.E. 27]. Pursuant to Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975) (per curiam), the court notified Wilkins

about the motion, the consequences of failing to respond, and the response deadline [D.E. 29]. On February 20, 2015, Wilkins responded in opposition to the motion for summary judgment [D.E. 36]. As explained below, the court grants defendants' motion for summary judgment in part and denies Wilkins's motion.

I.

Wilkins's claims arise out of his confinement in Central Prison. See Compl. [D.E. 1] 7–9. Wilkins has been in prison since 2000, during which time his mental health has often deteriorated and has required multiple trips to the in-patient mental health hospital at Central Prison. Pl. Aff. [D.E. 36-1] ¶ 3. On August 29, 2013, defendants Lee and Waddell "placed [Wilkins] on full restraints due to setting fire in his cell." Pl. Aff., Ex. 2 [D.E. 36-1] 6; see Pl. Aff. ¶ 10.[1]

On September 7, 2013, using a battery and a piece of paper with aluminum backing in his cell, Wilkins "set a fire in an attempt to kill [him]self" after expressing suicidal ideation to an unidentified "floor officer" who "told [Wilkins] to 'Go ahead.'" Compl. 8; see Pl. Aff. ¶ 6; Waddell Aff. [D.E. 27-1] ¶ 3 & Ex. A [D.E. 27-1] 5 (incident report), 8 (witness statement); Warren Aff. [D.E. 27-2] ¶ 4; Lee Aff. [D.E. 27-3] ¶ 4; Fox Aff. [D.E. 27-4] ¶ 4. A correctional officer (Jackson) noticed smoke coming from Wilkins's cell and defendant Lee "used a fire extinguisher to put out the fire, and also restrained the Plaintiff and removed him from his cell." Lee Aff. ¶ 5; see Waddell Aff., Ex. A [D.E. 27-1] 8; Warren Aff. ¶ 5; Fox Aff. ¶ 5. Jackson then escorted Wilkins to the shower, after which Wilkins received medical attention. Waddell Aff., Ex. A [D.E. 27-1] 5, 11. A nurse found Wilkins "in no acute distress." Waddell Aff., Ex. A [D.E. 27-1] 11. Wilkins states that

---

[1] Between November 16, 2011, and August 28, 2013, Wilkins set a fire five times. See N.C. Dep't of Pub. Safety, Offender Pub. Info., http://webapps6.doc.state.nc.us/opi/viewoffender.do?method=view&offenderID=0502449&searchOffenderId=0502449&listurl=pagelistoffendersearchresults&listpage=1 (click on "View Infractions") (last visited July 20, 2015).

2

he suffered a "raw and sore throat from inhaling smoke," Pl. Resp. Opp'n Mot. Summ. J. [D.E. 36] 8, and on September 25, 2013, a nurse provided him with throat lozenges. Pl. Aff., Ex. 3 [D.E. 36-1] 7.

"During the fire the sprinkler system did not come on." Waddell Aff., Ex. A [D.E. 27-1] 5 (statement by Wilkins in the incident report). Wilkins alleges not only that staff "allowed [him] to keep the material to start a fire" but also that defendants Warren and Fox, two unit managers, disabled the sprinkler system. Compl. 8. Wilkins states that he later learned that defendants "routinely cut off" the sprinkler system or know that it is disabled "in order to prevent floods that are intentionally set by 'popping' the sprinklers." Pl. Aff. ¶ 8. Warren and Fox deny disabling the sprinkler system. Warren Aff. ¶ 3; Fox Aff. ¶ 3. Central Prison staff investigated the incident and found that "the fire suppression system was fully operational on that housing unit; however the fire did not produce enough heat or smoke to activate the fire suppression system." Waddell Aff., Ex. A [D.E. 27-1] 5; see Warren Aff. ¶ 4; Fox Aff. ¶ 4. Wilkins states that "[t]he fire produced a lot of heat and smoke" and notes that "the person that conducted the so-called investigation is a Seargent [sic] that works directly under . . . Warren and Fox." Pl. Aff. ¶¶ 7, 9.

Following the incident, defendant Waddell "approved a request by Defendant Warren, as is allowed by NCDPS practice and policy, that Plaintiff be placed on 'Fire Restrictions' which provides that an inmate that sets a fire in the facility will have certain of his property removed for a period of thirty days." Waddell Aff. ¶ 5; see Warren Aff. ¶¶ 7–8. "These measures are put in place to protect an inmate from his own actions and the staff from dangerous actions of the inmate." Waddell Aff. ¶ 6; Warren Aff. ¶ 9. The restrictions Waddell implemented "allowed [Wilkins] to maintain his shirt, boxer shorts, socks, and a mattress." Waddell Aff. ¶ 5. Nonetheless, Wilkins contends that Waddell denied him a mattress. Pl. Aff. ¶ 11. Moreover, mental health staff subsequently screened

3

Wilkins and implemented "a therapeutic treatment level that altered [Wilkins's] conditions of confinement." Waddell Aff. ¶ 8; Warren Aff. ¶ 6; see Pl. Aff. ¶ 14 & Ex. 3 [D.E. 36-1] 7 (9/7/13 mental health inpatient admission orders for "Therapeutic Seclusion"). Wilkins alleges that these conditions included "sleep[ing] on the cold concrete slab for 30 days" in a cell that was so cold "nursing staff and floor officers had to wear coats and scarves to stay warm" while Wilkins was dressed only in "a smock that left all [his] extremities exposed to the frigid conditions." Compl. 9; see Pl. Aff. ¶¶ 11, 16; cf. Warren Aff. ¶ 6; Lee Aff. ¶ 6;. Wilkins alleges that the temperature caused "constant back spasms and lower back pain." Compl. 9; see Pl. Aff. ¶ 19. Wilkins states that he complained to defendants Warren, Fox, and Lee about the temperature, but they "upheld and enforced this decision." Compl. 9.

Waddell states that the decision of mental health staff to place Wilkins on these restrictions "is a medical decision based on the inmate's clinical presentation made by a healthcare professional," that the type of smock issued to Wilkins "is specifically designed to ensure the inmate is provided the ability to stay warm or otherwise clothed when an inmate has, as Plaintiff Wilkins had, used materials in their property to set fires," and that "[i]n the Mental Health unit, the temperature is maintained at 72 degrees by maintenance" and "[c]orrectional staff . . . does not have the ability to alter the temperature on the blocks." Waddell Aff. ¶¶ 8–10. Moreover, Wilkins claims that mental health staff raised his restriction level while he was in therapeutic seclusion, but he states defendants Warren and Waddell "instructed psychologists and mental health staff to deny me a mattress and force me to sleep on a cold concrete slab with only a smock for thirty straight days" and that he complained to defendants Fox and Lee who "actively enforced these medieval torture methods." Pl. Resp. Opp'n Mot. Summ. J. [D.E. 36] 3–4; see Pl. Aff. ¶¶ 14, 18, 25 & Exs. 3–4 [D.E. 36-1] 7–10.

4

Wilkins has submitted a portion of his medical records from therapeutic seclusion, which indicate that he received frequent checks and attention during the time he was placed on restrictions. Pl. Aff., Exs. 3–4 [D.E. 36-1] 7–10. The notes do not indicate that anyone observed Wilkins in any physical distress, or that he informed anyone of his pain or discomfort. Id.

II.

The court first addresses Wilkins's motion for reconsideration of Magistrate Judge Jones's April 17, 2015 order [D.E. 41–42]. The court has reviewed the motion under the governing standard. See Fed. R. Civ. P. 54(b); Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505, 514–15 (4th Cir. 2003). Wilkins's motion lacks merit and is denied.

Next, the court addresses defendants' motion for summary judgment. Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment initially must demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Once the moving party has met its burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249–50. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

In order to prove that prison conditions violate the Eighth Amendment, a plaintiff must prove "(1) that the deprivation of a basic human need was objectively sufficiently serious, and (2) that

5

subjectively the officials acted with a sufficiently culpable state of mind." De'lonta v. Johnson, 708 F.3d 520, 525 (4th Cir. 2013) (quotation and alteration omitted); see Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999); Strickler v. Waters, 989 F.2d 1375, 1379 (4th Cir. 1993). "Only an extreme deprivation, that is, a serious or significant physical or emotional injury resulting from the challenged conditions, or substantial risk thereof, will satisfy the objective component of an Eighth Amendment claim challenging conditions of confinement." De'lonta, 708 F.3d at 525 (quotation omitted); see, e.g., Helling v. McKinney, 509 U.S. 25, 35–36 (1993); Hudson v. McMillian, 503 U.S. 1, 8–9 (1992). The subjective prong requires the plaintiff to show that the prison official acted with deliberate indifference. See, e.g., Farmer v. Brennan, 511 U.S. 825, 835 (1994); De'lonta, 708 F.3d at 525; Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998); Strickler, 989 F.2d at 1379.

"[D]eliberate indifference entails something more than mere negligence, . . . [but it] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. Deliberate indifference requires that an official actually know of and disregard an objectively serious condition, medical need, or risk of harm. See id. at 837; De'lonta, 708 F.3d at 525. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer, 511 U.S. at 837. "It is not enough that the [prison official] should have recognized" the objectively serious condition, medical need, or risk of harm. Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (emphasis, quotation, and citation omitted). Rather, a plaintiff must prove "actual knowledge of the risk of harm to the inmate." Id. (emphasis omitted). However, "[a] prison official's subjective actual knowledge can be proven through circumstantial evidence . . . ." Makdessi v. Fields, No. 13-7606, 2015 WL 1062747, at *6 (4th Cir. Mar. 12, 2015). "[A]n injury might be so obvious that the factfinder could conclude that the guard did know of it because he could

6

not have failed to know of it." Id. (quotation omitted). A prisoner's failure to give advance warning of or protest exposure to the risk is not dispositive concerning actual knowledge. Id. at *8.

Beyond such actual knowledge, the prison official "must also have recognized that his actions were insufficient to mitigate" the objectively serious condition, medical need, or risk of harm. Iko, 535 F.3d at 241 (quotation and emphasis omitted). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." Whitley v. Albers, 475 U.S. 312, 319 (1986), abrogated on other grounds by Wilkins v. Gaddy, 559 U.S. 34 (2010); see Wilson v. Seiter, 501 U.S. 294, 298–99 (1991). Deliberate indifference "sets a particularly high bar to recovery." Iko, 535 F.3d at 241.

Initially, defendants argue that the Eleventh Amendment bars any official-capacity claim for monetary damages. Defs.' Mem. Supp. Mot. Summ. J. [D.E. 28] 11–12. Defendants' argument is correct. See, e.g., Hafer v. Melo, 502 U.S. 21, 25–27 (1991); cf. Will v. Mich. Dep't of State Police, 491 U.S. 58, 63–71 (1989). Although Wilkins's complaint includes a request for prospective injunctive relief "ordering defendants to cease and desist with leaving prisoners in restraints while locked in shower," Compl. 5, the court has dismissed Wilkins's claim concerning the shower. Order [D.E. 7] 3–4. Thus, the court grants defendants' motion for summary judgment and dismisses Wilkins's official-capacity claims.

Next, the court addresses Wilkins's claim that defendants failed to protect him from himself. "[P]rison officials have a duty to protect prisoners from self-destruction or self-injury." Lee v. Downs, 641 F.2d 1117, 1121 (4th Cir. 1981); see De'lonta, 708 F.3d at 525; Williams v. Branker, 462 F. App'x 348, 354 (4th Cir. 2012) (unpublished); Taylor v. Friedman, No. 5:14-CT-3065-H, 2015 WL 1284236, at *5 (E.D.N.C. Mar. 18, 2015) (unpublished). In analyzing this claim, "the court must focus on whether defendants actually knew and disregarded an objectively serious risk"

7

that Wilkins would set fire to his cell in an attempt to commit suicide. Smith v. Atkins, 777 F. Supp. 2d 955, 964 (E.D.N.C. 2011) (collecting cases); see Taylor, 2015 WL 1284236, at *5. Wilkins has presented evidence that defendants Lee and Waddell knew that he had a history of setting fires before September 7, 2013. Defendants, however, have not explained their roles in screening Wilkins for what he would have in his cell, what steps they took to enforce the fire restrictions between August 29 and September 7, 2013, and whether they had any knowledge that Wilkins had ever tried to commit suicide in custody by setting a fire in his cell. Cf. Germain v. Shearin, 531 F. App'x 392, 396 (4th Cir. 2013) (per curiam) (unpublished). Defendants also have not addressed whether Wilkins suffered an objectively "serious or significant physical or emotional injury" sufficient to proceed on this claim. Id. at 395; cf. Kartman v. Markle, 582 F. App'x 151, 153–54 (4th Cir. 2014) (per curiam) (unpublished); Encarnacion v. Dann, 80 F. App'x 140, 141 (2d Cir. 2003) (per curiam) (unpublished). Thus, on this record, the court denies defendants' motion for summary judgment.

Next, the court addresses Wilkins's claim concerning the conditions of his confinement in therapeutic seclusion. The court must view the conditions of which Wilkins complains in their totality. See, e.g., Wilson, 501 U.S. at 304; Williams v. Griffin, 952 F.2d 820, 824 (4th Cir. 1991).

Defendants have failed to address many of Wilkins's allegations, particularly his allegations concerning sleeping on a concrete slab, the temperature in his cell, and whether he complained to defendants about the conditions in his cell. Cf. Germain, 531 F. App'x at 397–98; McCray v. Burrell, 516 F.2d 357, 368–69 (4th Cir. 1975) (en banc). Thus, on this record, the court denies defendants' motion for summary judgment.

Alternatively, defendants assert that they are entitled to qualified immunity. Defs.' Mem. Supp. Mot. Summ. J. 9–10. The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as

8

their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (per curiam); City & Cty. of San Francisco v. Sheehan, 135 S. Ct. 1765, 1774 (2015); Carroll v. Carman, 135 S. Ct. 348, 350 (2014) (per curiam); Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Taylor, 135 S. Ct. at 2044; Sheehan, 135 S. Ct. at 1774; Carroll, 135 S. Ct. at 350.

The court asks two questions to determine whether qualified immunity applies. See, e.g., Reichle, 132 S. Ct. at 2093; Pearson v. Callahan, 555 U.S. 223, 232 (2009); Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010). Courts have discretion about which question to address first. Pearson, 555 U.S. at 236. The court must determine "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Id. at 232. The court also must determine "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." Id. "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011) (alterations and quotations omitted). The United States Supreme Court does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id.; see Reichle, 132 S. Ct. at 2093. Thus, defendants are entitled to summary judgment on qualified immunity grounds if the answer to either question is "no." See, e.g., Reichle, 132 S. Ct. at 2093; al-Kidd, 131 S. Ct. at 2080; Miller v. Prince George's Cty., 475 F.3d 621, 627 (4th Cir. 2007); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 606 (E.D.N.C. 2009).

9

The record precludes a determination of qualified immunity at this time. On a more fully developed record, defendants may reassert this defense. Defendants also may renew their motion for summary judgment on the merits of plaintiff's claims. See, e.g., Germain v. Shearin, No. 1:11-cv-1613-JFM, 2014 WL 120553, at *1 (D. Md. Jan. 13, 2014) (unpublished), aff'd, 570 F. App'x 324 (4th Cir.) (per curiam) (unpublished), cert. denied, 135 S. Ct. 193 (2014).

III.

In sum, the court GRANTS IN PART defendants' motion for summary judgment [D.E. 27] and DISMISSES plaintiff's official-capacity claims. Defendants may file a renewed motion for summary judgment on or before August 31, 2015. The court DENIES plaintiff's motion for reconsideration [D.E. 42].

SO ORDERED. This 20 day of July 2015.

JAMES C. DEVER III
Chief United States District Judge